UNITED STATES of America, Appellee,

v.

Aristedes DROUGAS,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Michael A. KARAHALIS,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Arnold W. ELLIS, Jr.,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alfonso DEFEO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Salvatore ALBA, Defendant, Appellant.

Nos. 83–1278 to 83–1282.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1984.

Decided Nov. 7, 1984.

Michael C. Bourbeau, Los Angeles, Cal.,
with whom Mark S. Bourbeau, Boston,

Mass., was on brief, for defendant, appellant Arnold Ellis, Jr.

William Doyle, Boston, Mass., with whom Thomas Troy, Boston, Mass., was on brief, for defendants, appellants Aristedes Drougas and Michael Karahalis.

Ellen K. Wade, Boston, Mass., for defendant, appellant Salvatore Alba.

Harvey Rowe, Salem, Mass., for defendant, appellant Alfonso Defeo.

Janis M. Berry, Sp. Atty., U.S. Dept. of Justice, Boston, Mass., with whom William F. Weld, U.S. Atty., and Jeremiah T. O'Sullivan, Sp. Atty., Boston, Mass., were on brief for appellee.

Before BOWNES and BREYER, Circuit Judges, and SELYA,* District Judge.

BOWNES, Circuit Judge.

Defendants Aristedes Drougas, Michael Aristotle Karahalis, Arnold Ellis, Jr., Alfonso DeFeo, and Salvatore Alba appeal their convictions on charges of conspiracy to import marijuana in violation of 21 U.S.C. § 963, conspiracy to possess with intent to distribute in violation of 21 U.S.C. § 846, importation of marijuana in violation of 21 U.S.C. § 963, and possession with intent to distribute in violation of 21 U.S.C. § 841.[1] On appeal defendants assert numerous challenges including: (1) the evidence was insufficient to convict them of the crimes alleged in the indictment; (2) prejudicial pretrial publicity prevented defendants from receiving a fair trial; (3) the trial court's failure to sever defendants resulted in an inability to effectively present antagonistic defenses; (4) the government failed to make timely disclosure of exculpatory evidence; (5) the identification of defendant Ellis was the product of an impermissibly suggestive pretrial identification procedure; (6) the government charts summariz-

ing telephone traffic among various defendants' houses and places of business should not have been admitted into evidence; (7) anonymous drafts of conspiracy profit distributions should have been excluded; (8) there was insufficient evidence of the conspiracy to admit hearsay statements by defendants against their alleged coconspirators; and (9) various jury instructions were improper or inadequate. After considering each of the claims, we affirm the convictions of all defendants.

This case involves the northern network of an allegedly large-scale interconnected series of drug smuggling operations, sometimes referred to as the "Grouper" conspiracies. In February 1982 the government indicted twelve conspirators for allegedly planning and executing the smuggle of two boatloads of marijuana into Gloucester, Massachusetts, in or about June and in November of 1977.[2] Defendants Drougas and Karahalis and several unindicted coconspirators allegedly organized and supervised the importations and controlled the distribution of profits. Defendant Ellis, a Massachusetts State Trooper, allegedly provided "protection" to the operation by monitoring police activities, periodically supplied weapons to conspirators, and drove a camper filled with marijuana from the Boston area to New York for further distribution. Defendant Alba allegedly supplied the fishing boat used to bring the marijuana from a "mother ship" to shore and acted as ship captain in the first smuggle. Defendant DeFeo was alleged to have contributed his place of business, Service Salvage Pool, an automobile salvage garage and warehouse in Middleton, Massachusetts, to store the marijuana and to have accompanied Trooper Ellis to New York in the camper. Although the salvage garage was used to store the marijuana

---

* Of the District of Rhode Island, sitting by designation.

1. In addition to the five defendants who have brought this appeal, five defendants pleaded guilty before trial and two defendants were acquitted by the jury.

2. The alleged conspiracy also included two government witnesses who were given immunity in exchange for their testimony and two smuggle organizers who were convicted in Florida of conducting a continuing criminal enterprise in violation of the narcotics "kingpin" statute, 21 U.S.C. § 848.

from both the first and second smuggles, there was testimony that DeFeo refused to participate in the second smuggle and was out of town when it transpired. He was convicted of conspiracy in the first smuggle but was acquitted of the substantive counts relating to the second importation in November.

## I. SUFFICIENCY OF THE EVIDENCE

■ Defendants contend that the evidence was insufficient to show beyond a reasonable doubt that the substance involved was marijuana, that there was no evidence showing the intent to agree that is required for conspiracy, and the evidence did not show an ongoing conspiracy as alleged in the indictment. In reviewing the sufficiency of the evidence, we consider the evidence as a whole, taken in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found each defendant guilty beyond a reasonable doubt. *United States v. Patterson,* 644 F.2d 890, 893 (1st Cir.1981).

■ The claim that the government failed to prove that the substance involved was marijuana does not require detailed consideration. The smuggling ventures were not discovered until more than four years after their successful completion so that the government was not able to introduce any samples of the substance involved. Notwithstanding that the marijuana was gone, its existence could be proved by circumstantial evidence. *United States v. Honneus,* 508 F.2d 566, 576 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). *See also United States v. Sanchez,* 722 F.2d 1501, 1506 (11th Cir.1984), *cert. denied,* — U.S. ——, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984) (circumstantial evidence used to prove existence of cocaine). The government witnesses testified that the substance being off-loaded from the boats while they and the other members of the conspiracy watched or assisted was marijuana. The surreptitious behavior of the defendants and the compensation paid for their servic-

es corroborate the witnesses' testimony. We find the evidence more than sufficient for the jury to have found beyond a reasonable doubt that the substance involved was marijuana.

■ The gist of conspiracy is an agreement to disobey or to disregard the law. Two types of intent must be proven: intent to agree and intent to commit the substantive offense. *United States v. Flaherty,* 668 F.2d 566, 580 (1st Cir.1981). A conspiratorial agreement may be proven by circumstantial as well as direct evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "A common purpose and plan may be inferred from a development and a collocation of circumstances." *Id.; United States v. Peters,* 732 F.2d 1004, 1007 (1st Cir.1984). The government need not exclude every reasonable hypothesis inconsistent with guilt with respect to each piece of circumstantial evidence. Rather, "the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant the jury to conclude that defendant is guilty beyond a reasonable doubt." *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir.1964). *See also Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954). The evidence of each defendant's participation from which intent and agreement can be inferred is as follows.

### A. *Drougas*

Drougas participated in organizational meetings prior to the first importation. During one of the meetings, he discussed the use of various off-load sites "up north" and problems involving the release of a Colombian hostage. Prior to the first smuggle, Drougas visited the storage warehouse where the marijuana was to be stored and viewed the fishing vessel to be used in the first off-load. Drougas also participated in viewing the dock where the off-loads were to take place and remarked to coconspirators that "next time" they should use fishing boxes so that "it" would

look like fish. Drougas also participated in trying to retrieve a letter that was left on one of the off-load boats from the captain, Alba. During the period that the organizational meetings were held at Howard Johnson's in Danvers, Drougas was registered in various rooms there. Telephone records show that a number of calls were made to residences and places of business of other coconspirators from his rooms. Drougas also participated in organizational meetings related to the second November importation and arranged for the employment of the second off-load crew which included his nephew and brother-in-law.

### B. *Karahalis*

Karahalis, too, participated in presmuggle organizational meetings and was registered at the Howard Johnson's in Danvers. After the first smuggle, Karahalis pressed the "kingpin" organizer from Florida for the distribution of proceeds. In November Karahalis, accompanied by the government witness, obtained a scale with which to weigh the marijuana from the second off-load and participated in the weighing. When the captain of the second fishing boat complained about the damage to his boat, he sought compensation from Karahalis.

### C. *Ellis*

Ellis participated in a presmuggle meeting at the Howard Johnson's in Danvers and was introduced to one of the conspirators who testified for the government as the man who would provide "protection" for the operation. Ellis went to the warehouse with Drougas to determine its suitability for the storage of marijuana. Ellis also provided several of the conspirators with guns that were carried during the importations, and was present at the scene of the off-loading. Ellis and defendant De-Feo drove a camper loaded with part of the June off-load to New York where they were met by two other conspirators.

A second government witness testified that Ellis had approached him sometime in July and inquired whether he would captain a fishing boat. Ellis showed the witness a shaving kit bulging with cash that Ellis said he had received for driving a camper filled with marijuana to New York. Placemats showing a tentative division of the spoils for the various conspirators involved in the November off-load were found in Ellis' apartment.

### D. *Alba*

Alba was identified as the person who supplied and captained the fishing boat used to bring the marijuana from the mother ship to shore in the first smuggle. Alba attended post-importation meetings at the Howard Johnson's to discuss the return of a letter left on his boat during the importation and his demand for $90,000 to compensate him for the damage to the boat. Telephone records showed a long-distance call from the Danvers Howard Johnson's to Alba's house in Saugus, Massachusetts, during the time of the June off-load.

### E. *DeFeo*

DeFeo owned Service Salvage Pool in Middleton, Massachusetts, where the marijuana was stored after the two importations. DeFeo was present with Ellis and Drougas when another conspirator was told that the warehouse was used as a "stash" facility. DeFeo was aboard the fishing boat during the first smuggle and assisted in the off-loading. When several bales broke open en route, he stuffed loose marijuana into his pockets. DeFeo also accompanied Ellis to New York in a marijuana filled camper.

———

■ Based on the evidence summarized above and the other evidence presented at trial, we conclude that there was sufficient evidence against each of the defendants to convict them of conspiracy to import marijuana and conspiracy to possess with intent to distribute.

## II. SINGLE V. MULTIPLE CONSPIRACIES

In addition to the traditional challenges on the sufficiency of the evidence, defendants argue that the conspiracy they were convicted of was the wrong one. The government alleged that both the June and

November smuggles were part of an ongoing conspiracy; defendants claim that the evidence showed that each smuggle was a separate mini-conspiracy and not part of an ongoing plan. Defendants argue that the evidence was insufficient to establish that they individually participated in one overall conspiracy, that the government's proof of only more limited conspiracies resulted in a fatal variance in the indictment, and that each defendant was prejudiced by having been joined with the others.

 Whether a single or multiple conspiracy exists is a question of fact for the jury to determine. *United States v. Elam*, 678 F.2d 1234, 1245 (5th Cir.1982); *United States v. Brito*, 721 F.2d 743, 747 (11th Cir.1983). While the nature of the illegal activity, the method of operation, and the scope of conspirator involvement are factors to be considered in determining whether a single conspiracy has been proved, if the totality of the evidence is adequate to demonstrate that all of the alleged coconspirators directed their efforts towards the accomplishment of a common goal or overall plan, then the existence of a single conspiracy can be found. *See United States v. Digregorio*, 605 F.2d 1184, 1192 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *Elam*, 678 F.2d at 1245; *Brito*, 721 F.2d at 747.

The government introduced a number of actions and statements by the coconspirators that suggested an ongoing long-range plan to import illegal drugs. Drougas and Karahalis participated in an organizational meeting in the spring of 1977 in which one of them presented nautical charts and they both discussed off-load marijuana locations "up north." One of the organizing coconspirators, not indicted in this case, stated prior to the importations that the amount of marijuana in the first smuggle would be small because he wanted to check out Karahalis' and Drougas' operation. A week or so after the organizational meeting when Drougas, Alba, and the government's witness visited the Gloucester dock to check out the area, Drougas commented that it would be a good idea to bring the next load up in boxes so it would look like fish. During the first smuggle, Alba's fishing boat was damaged and he retained a letter that belonged to another conspirator in order to extort $90,000 for "boat repairs." Drougas, Corporal Ellis, and the government witness conspirator all urged Alba to return the letter and Alba was told that he should return the letter because the owners of the letter were "nice people" who might give him another job in the future.

 The design and implementation of the second importation was very similar to the first: a fishing boat and mother ship were lashed together offshore to effect the transfer of cargo and importation of the marijuana, the same Gloucester dock was used as the off-loading point, Ellis was present to monitor police activity in the area as he was in the first smuggle, and the same warehouse was used to store the marijuana. Finally, the central conspiratorial figures planned and carried out both smuggles. The fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies. *United States v. Arruda*, 715 F.2d 671, 678 (1st Cir.1983); *United States v. Elam*, 678 F.2d at 1247. Based on the evidence, we cannot say the jury could not find beyond a reasonable doubt the existence of one overall conspiracy.

 Even if the evidence showed that two conspiracies rather than one were contemplated, variance in proof is grounds for reversal only when it affects a defendant's "substantial rights." *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1934); *United States v. Flaherty*, 668 F.2d 566, 582 (1st Cir.1981). A defendant's substantial rights in this context include the right to be sufficiently informed about the charges against him so he can prepare an effective defense and not be surprised at trial, and the right not to be subject to another prosecution for the same offense. *Id.* The doctrine of variance also includes protection against the possibility of prejudicial "spillover" or guilt by associ-

ation. *Flaherty*, 668 F.2d at 582; *United States v. Toliver*, 541 F.2d 958, 962–63 (2d Cir.1976). None of these defendants can reasonably claim to have been prejudiced by the form of the indictment. There was certainly sufficient evidence to show that Alba and DeFeo conspired to commit the first smuggle. Alba was not charged with the crimes relating to the second smuggle and DeFeo was acquitted on those counts, so neither of them would have benefited from a finding of multiple conspiracies. The evidence of Drougas' and Karahalis' participation in both smuggles was overwhelming; were the government to have successfully adopted the two conspiracy theory Drougas and Karahalis would have faced four conspiracy convictions rather than two. We find no prejudice here.

## III. IMPROPER JOINDER

Given the existence of a single conspiracy, the interrelation between the conspiracy count and the importation and possession counts, and the number of conspirators and defendants, the benefits to the government of trying the defendants together are obvious. The indictment charged twelve defendants with a yearlong conspiracy and substantive counts of importation of marijuana and possession with intent to distribute based on two complicated smuggling transactions. The trial lasted ninety-seven days, the longest criminal trial in the history of the District of Massachusetts, and consisted largely of the testimony and cross-examination of two immunized conspirators and a series of record keepers who were used to corroborate the stories of the two star witnesses through presentations of hotel registration records and evidence of telephone traffic during the period of the conspiracy. All of the evidence introduced at trial, with the exception of the evidence of the second importation vis-a-vis Alba, would have been admissible against each defendant in separate trials.[3] A complicated multi-party conspiracy, such as was involved here, is precisely the type of case where a joint trial is most

feasible. *See United States v. Arruda*, 715 F.2d at 679. Here, the credibility of the government witnesses and the coherence of the mosaic formed by the records were critical to the outcome of the case against each of the defendants. Defendants not only received the opportunity to cross-examine the witnesses but the benefit of whatever impeachment other defendants' counsel could provide.

Even though an initial joinder may be proper, a defendant may be entitled to severance pursuant to Federal Rule of Criminal Procedure 14 if he can show he would suffer substantial prejudice from a joint trial. *United States v. Walker*, 706 F.2d 28, 30 (1st Cir.1983); *United States v. Patterson*, 644 F.2d at 900. A motion for severance is addressed to the discretion of the trial court and should not be reversed without a strong showing of prejudice. *United States v. Arruda*, 715 F.2d at 679. Defendants claim they were prejudiced in three ways. Alba and DeFeo allege they were prejudiced by the "spillover" effect of the evidence in the second importation. Alba claims that if tried separately Drougas and DeFeo would have provided exculpatory testimony, and contrapuntally Drougas and Karahalis argue that they were unfairly precluded from presenting their defense because it was prejudicially antagonistic to Alba.

### A. *Spillover Claim*

In a case involving several defendants, the court must take care that evidence against one defendant is not misinterpreted by the jury and used as the basis for convicting another defendant not connected to that evidence. *United States v. Flaherty*, 668 F.2d at 582. Alba claims that because he did not participate in the second smuggle and was not charged with those crimes, only a severance could save him from the danger of being found guilty by association with others who had participated in the two smuggling transactions. In evaluating whether convictions were the result of confusion on the part of the jury,

---

**3.** Alba was not charged with any of the substantive counts related to the second smuggle.

the reviewing court must look to the number of defendants involved and the trial judge's efforts to reduce the possibility of "spillover." *Id. See also Blumenthal v. United States,* 332 U.S. 539, 560, 68 S.Ct. 248, 257–58, 92 L.Ed. 154 (1947). In this case, the trial court was careful to differentiate between Alba and the other conspirators. The trial judge issued a special "Alba" jury instruction in which he specifically directed the jurors not to take any of the evidence of the November smuggle into consideration in determining Alba's guilt or innocence. Thereafter, the judge named each of the witnesses and every exhibit that the jury was to exclude from its deliberation of Alba. The trial court's careful segregation and the ample evidence against Alba on all charges of which he was convicted lead us to conclude that Alba's spillover claim is without merit.

 DeFeo's claim of spillover prejudice is more difficult to comprehend since he was acquitted of the substantive charges relating to the second smuggle. His partial acquittal is, itself, a clear demonstration that the jury was not indiscriminately stirring the defendants together in a conspiracy soup. The evidence amply supports DeFeo's conviction for his part in the first smuggle, and we find no error in the trial court's denial of severance.

### B. *Codefendants' Testimony*

Alba also claims that he was deprived of testimony from codefendants that would have exonerated him because of his joinder with Drougas and DeFeo. After the government's case-in-chief, Alba offered an affidavit by DeFeo stating that if Alba were severed, DeFeo would testify he had never been on the fishing boat, the Sole, with Alba. Drougas offered an affidavit stating that he would testify in a separate trial that a phone call made from him to Alba was of an innocent nature.

 In order to be entitled to a severance on the basis of a codefendant's testimony the movant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed. *United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.1980); *United States v. Rice,* 550 F.2d 1364, 1369 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977). Given such a showing, the court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion. *United States v. Butler,* 611 F.2d at 1071; *United States v. Finkelstein,* 526 F.2d 517, 523–24 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). *See also United States v. Smolar,* 557 F.2d 13, 21 (1st Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (1977). In this case the government had clearly outlined the nature of its proof in twenty-seven overt acts included in the indictment, yet not until the seventy-second day of trial, after the government had finished its case-in-chief, did Alba come forward with the affidavits. The opportunistic timing of the proffer certainly casts doubts upon the bona fides of the affidavits. Moreover, Drougas' affidavit is not inconsistent with Alba's alleged participation in the conspiracy, and DeFeo's uncorroborated statement was controverted by the evidence presented at trial and would likely be subject to substantial, damaging impeachment. Under these circumstances, we do not find the court erred in failing to sever Alba. *See Gorin v. United States,* 313 F.2d 641, 646 (1st Cir.1963), *cert. denied,* 379 U.S. 971, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965).

### C. *The Sole v. Sicily Antagonistic Defense*

 The law in this circuit is well settled; "antagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other." *United States v. Arruda,* 715 F.2d at 679; *United States v. Talavera,*

668 F.2d 625, 630 (1st Cir.), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). Antagonism of defenses requires severance only where the defenses are so inconsistent that the jury would have to believe one defendant at the expense of the other; the conflict alone establishes the guilt of a defendant. *Id.*

 Drougas' and Karahalis' "antagonistic defense" consisted of a theory that the first smuggle alleged by the government to have been carried out through the use of the fishing boat, the Sole, on or about June 1977 was actually an independent caper of Alba's carried out with another boat, the Sicily, in May of 1977.[4] A jury finding that the conspirators executed the first smuggle but used a different boat or performed the smuggle two or three weeks before the approximate dates given by the government witness would not, by itself, have benefited Drougas or Karahalis. The indictment alleges only that the smuggle occurred "on or about June of 1977," the substantive charges do not name a particular boat, and only one of twenty-seven overt acts alleged refers to the Sole. As defendants appear to concede, such a variance in the indictment would not affect their substantial rights and would not be grounds for dismissal. *See United States v. Flaherty,* 688 F.2d at 582.

In order for the defendants' theory to have benefited them (or its preclusion to have caused prejudice), Drougas' and Karahalis' defense must in some way impeach the government witness' version of the first smuggle by making it either less likely that the smuggle occurred or less likely that Drougas or Karahalis were involved. From this vantage point, we examine defendants' antagonistic defense. The Sicily-not-Sole theory consisted of evidence that:

1. although Alba did have access to the Sole, he was not the owner nor an officer in the corporation that owned the Sole at the time of the alleged smuggle;

2. Alba did own the Sicily during May and June of 1977;

3. the DEA agent who had filed an affidavit erroneously identifying Alba as the owner of the Sole which led to the impoundment of the Sole testified on voir dire that "everyone was telling me that I had the wrong boat";

4. the government's witness could not pinpoint the precise date of the first smuggle nor remember the name of the fishing boat, although he placed several presmuggle meetings in May shortly after an operation on his knee;

5. a physician had treated the witness' knee on May 6, 1977;

6. several telephone calls from a Staten Island motel that were consistent with the government witness' story of distribution two weeks after the smuggle had been made on May 22nd and May 23rd, 1977;

7. the government witness testified that the boat used in the smuggle had sustained $20,000 to $50,000 damage in the first smuggle and Alba had requested $90,000 to repair it; and

8. a marine surveyor who had examined the Sole stated that the damages on the port side of the Sole had been repaired at an estimated cost of $25 to $30 while dock and insurance records showed that the Sicily was out of the water for $4,500 in repairs in June of 1977.

Despite Drougas' and Karahalis' protestations to the contrary, the trial court did not prevent defendants from challenging the government's proof on the use of the Sole and the date of importation. All defendants were given broad opportunity to cross-examine the government witness, including questioning his ability to recall the time and the boat involved in the first importation. The government stipulated that the witness had been treated for a knee injury on May 6th; defendants were allowed to impeach the witness' damage

---

**4.** This theory was antagonistic to Alba and other defendants both because it involved evidence that highlighted Alba's motive, opportunity, and ability to conduct a smuggle and because the evidence was not inconsistent with participation by Alba in a smuggle additional to the two alleged in the indictment.

estimate by calling the marine surveyor who had examined the Sole; and Drougas' counsel was permitted to call the DEA agent who had filed the affidavit that had brought about the impoundment of the Sole and examine him regarding the actual ownership of the Sole and his error. In short, the only evidence on the "antagonistic defense" that the trial court excluded was evidence that Alba owned a fishing boat named the Sicily that had been out of the water for substantial repairs during the time the government alleged the first smuggle had taken place.

 A judge may limit the scope of impeachment evidence or cross-examination so long as his discretion is exercised with caution and solicitude for the defendant's sixth amendment rights. *United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982); *United States v. Houghton,* 554 F.2d 1219, 1225 (1st Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). Here, Drougas and Karahalis were given a full opportunity to proffer the nature and extent of their evidence that the boat involved in the first smuggle was not part of the alleged conspiracy. Defendants could only show that the Sicily had been available in May and was not available in June. They could not show any relationship between the Sicily having been used and the Sole not having been used or that the Sicily could not have been used in furtherance of the conspiracy. Alba, DeFeo, and two other defendants not involved in this appeal raised strenuous objection to the Sicily testimony on the grounds of irrelevance and prejudice. Alba, in particular, was concerned that the evidence would suggest that Alba and others had participated in a smuggle in May on the Sicily and in June on the Sole. Other defendants objected to the introduction of the Sicily material on the seventy-ninth day of trial because they would need time to prepare alibis to cover the new dates.[5] The government also pointed out that evidence of the Sicily being beached could strengthen the government's case because, although Alba was not the owner, he did have access to the Sole and would have had a motive to use it if his own boat was unavailable.

After three days of voir dire, the trial court excluded the evidence of the Sicily having been out of the water for repairs in June of 1977 on the grounds of irrelevance, prejudice, jury confusion, and because it would result in undue delay in the trial. Although Drougas contends that his evidence was relevant because it made it less likely that the Sole rather than the Sicily was used, it is not the boat that is the subject of the charge, but the conspiracy. In rendering his evidentiary ruling, the judge stated: "I conclude that [the proffered testimony on the Sicily] ... is not evidence that would contribute in any reasoned way to creation of a reasonable doubt by the factfinder as to any element of the offense charged." We agree and find no abuse of discretion by the trial court in excluding evidence that another boat owned by Alba had not been seaworthy at the time of the first smuggle. The exclusion did not unduly restrict defendants' constitutional right to confront witnesses or to present witnesses in their own behalf.

## IV. EXCULPATORY EVIDENCE

Defendants claim that contrary to the magistrate's pretrial order and the holding in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government withheld exculpatory evidence in the form of inducements, promises, and rewards offered to the government's primary witness in exchange for his testimo-

---

**5.** Although we note defense counsel's stated concerns, they did not play any part in our decision. While Drougas' counsel did not formally announce his Sicily-not-Sole theory until the seventy-ninth day of trial, the possibility that the first smuggle occurred in May was of continuing, express concern to defense counsel beginning on trial days twenty-eight and twenty-nine.

On those days, the government introduced records of telephone traffic between two conspirator meeting places on May 22, 1977. The potential implication that the first smuggle occurred in May rather than June was fully recognized and discussed by all counsel in their arguments on the admissibility of the May telephone records on days thirty and thirty-one.

ny, and information from other legal proceedings and interview sessions that could be used to impeach him.

Specifically, defendants allege that the prosecution withheld: (1) the promise that the witness' grand jury testimony would not be made public; (2) a promise that the witness would not be deported; (3) the promise that a fraudulently obtained passport violation would not be pursued; and (4) various claimed misidentifications of people and boats involved in the smuggles.

In order to understand the basis and gravity of defendants' claims, it is necessary to give a brief history of their claims and the context of the trial proceedings out of which they arose. The government's primary witness had participated in a number of smuggles related and unrelated to the issues in this trial, and had testified previously in Maryland, Florida and Louisiana proceedings under grants of immunity. Consequently, a great deal of information that potentially contained impeachment material in the form of character evidence, bias, and prior inconsistent statements had been elicited from the witness. The magistrate in this case entered a pretrial order requiring the government to produce all exculpatory material except to the extent the information was Jencks Act material.[6]

Pursuant to the magistrate's order and prior to the government's first witness taking the stand, the government produced copies of the nonprosecution agreement between the government witness and the Eastern District of Louisiana, the Southern District of Florida, and the District of Massachusetts, along with a cover letter stating the witness' sentence in Louisiana had been reduced from five years to four years. The government also included a brief description of the various incidents for which the witness had received immunity, a copy of the witness' prior convictions, a twenty-five page debriefing report that had been prepared by the Drug Enforcement Administration based on interviews with the

government witnesses, the grand jury testimony in Massachusetts, and the grand jury testimony and witness' testimony at trial in Florida.

On the day following the conclusion of the direct testimony of the witness (the first witness to testify at trial), the district court entered a Jencks Act *in camera* production order for all statements, notes and reports related to the witness' appearance and in possession of the government so that it could determine which notes fell within the definition of "statements" relating to the "subject matter to which the witness testified." *See* 18 U.S.C. § 3500(c). Rather than delay the trial by contesting the applicability of the Jencks Act to each item, the government volunteered to release all grand jury transcripts from Maryland and Louisiana. The complete transcripts, numbering approximately 900 pages, were given to defense counsel three days later, on the fourth day of cross-examination.

At the same time as the Jencks Act motion was being considered, the court directed the prosecutor to find out whether any oral promises were made in Florida, Louisiana, or Maryland in addition to the immunity listed in the nonprosecution agreement because the witness' answers on preliminary cross-examination had given rise to an inference that he believed that, in addition to immunity for acts described by the government in its cover letter, he would not be prosecuted or deported for a fraudulently obtained passport.

The following morning the prosecutors produced a letter from the Assistant United States Attorney in Maryland stating he did not plan to prosecute the passport violation because he believed the Louisiana nonprosecution agreement precluded him from doing so since the passport had been obtained in furtherance of a conspiracy for which the witness had been granted immunity. No "nondeportion" agreement existed. The trial court ordered the disclosure

---

**6.** Under the Jencks Act, 18 U.S.C. § 3500, the prosecution must, after a witness has testified and upon defendants' request, produce previous statements by the witness that relate to the subject matter as to which the witness testified.

of that part of the grand jury transcript from Maryland that contained the interpretation of the nonprosecution agreement.

For their claims to require reversal, defendants must show that: (1) the evidence denied them was, in fact, exculpatory; (2) the evidence was material; and (3) the government's failure to disclose the evidence resulted in undue prejudice. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs,* 427 U.S. 97, 99, 96 S.Ct. 2392, 2395, 49 L.Ed.2d 342 (1976). Evidence relating to the impeachment of prosecution witnesses and immunity or other preferential treatment given to prosecution witnesses is deemed to be exculpatory within the meaning of the *Brady* rule. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Peters,* 732 F.2d at 1008. Where, however, the defense is confronted not with complete suppression, but with delayed disclosure, reversal will be granted only if defendants were denied the opportunity to use the disclosed material effectively. *Peters,* 732 F.2d at 1009.

### A. *Secrecy of Grand Jury Testimony*

Defendants claim that a promise that the grand jury testimony would not be made public was an inducement that should have been disclosed. Specifically, the witness stated on cross-examination that he believed that the conspirators against whom he testified would not be privy to the information he disclosed to the grand jury. Apparently, this impression arose out of a discussion with the Louisiana Assistant United States Attorney about Federal Rule of Criminal Procedure 6(e) which generally provides that no one shall disclose matters occurring before the grand jury except to government attorneys for use in the performance of such attorney's duty or upon order of the court. Obviously, a government attorney's explanation of the Rules of Criminal Procedure to a witness does not constitute an inducement "known to the prosecutor but unknown to the defense" within the scope of the *Brady* disclosure

rule. *Agurs,* 427 U.S. at 97, 96 S.Ct. at 2392.

### B. *Promise of Nonprosecution for Fraudulent Passport*

On cross-examination defense counsel discovered that the government's primary witness had fraudulently obtained a passport but was not going to be charged with the crime. Neither the immunity agreement nor the description of the incidents covered by the agreement that the prosecution had submitted to defense counsel contained any reference to a fraudulent passport. After the court ordered the government to investigate, the prosecutors obtained a letter from the Maryland prosecutor stating that his interpretation of the nonprosecution agreement, which defendants had been given before trial, precluded prosecution because the passport had been obtained in order to carry out a smuggle for which the witness had received immunity. Even were we to find that the prosecutors' description of the incidents covered by the nonprosecution agreement was inadequate to give defense counsel a complete and accurate picture of the scope of the witness' immunity, the nonprosecution for a fraudulently obtained passport was a minor benefit compared to the other crimes for which the witness had received immunity. The impeachment value of the passport violation was minimal at best. Moreover, after discovery of the immunity on the passport charge, defendants were afforded further cross-examination on this matter. There is no basis for finding that defendants suffered any prejudice from the late disclosure.

### C. *Promise of No Deportation*

Although the witness stated on cross-examination that he hoped his fraudulent passport would not result in his deportation, the prosecutors, upon inquiry, were told both by the prosecutor in the Louisiana case and the witness' lawyer that no promise regarding deportation had been made.

### D. *Misidentifications*

■ Various defendants claim to have been prejudiced by the government's failure to disclose their witness' alleged misidentifications of defendants and boats used in the smuggle. We find these claims to be without merit. The government's primary witness had a very pronounced Greek accent and had not been completely familiar with the English language at the time of the incidents.[7] The defendants' allegations of withheld evidence consist of mispronounciations or transcription errors that were contained in the Florida and Louisiana grand jury proceedings wherein the witness referred to the boat captain as "Sally" (alleged by the government to be Salvatore Alba), and the conspirator policeman as "Eddie the cop" (alleged by the government to be Trooper Arnold Ellis). Although the transcripts containing these references were not received until four days after cross-examination of the witness had begun, defendants were subsequently given a full opportunity to cross-examine the witness on the "misidentifications." We find no prejudice resulted.

■ Finally, defendants claim that the prosecutors withheld the actual name of the mother ship used in the first smuggle. The witness had testified in the Florida grand jury proceeding that the mother ship used was the "Willie"; the actual name of the ship was the "Willeg." In his testimony before the trial court the witness testified that he didn't know the name of the mother ship, although he later named the Willeg on cross-examination. The prosecutors thereafter supplied the grand jury transcripts in the Louisiana and Maryland cases wherein the witness had named the Willeg. Although we find the prosecutors' conduct with respect to the Willeg misleading, defendants were given an additional four and a half days to cross-examine the witness. The defendants did not begin presentation of their evidence until some forty days later so there was time for defendants' counsel to investigate the country of registration and trip records of the Willeg.

Therefore, we find that defendants were not prejudiced by the prosecutors' failure to disclose the name of the Willeg sooner.

### V. EVIDENTIARY CHALLENGES

Defendants raise objection on the grounds of irrelevance and prejudice to two forms of circumstantial evidence that were introduced to corroborate the government's principal witness. They first challenge a chart summarizing the telephone traffic between various residences, places of business, and meeting places associated with the conspirators. The second challenge, asserted by Drougas, Karahalis, and Ellis, is the admission into evidence of two motel placemats on which rough calculations of the profit breakdown for the second smuggle appear to have been scribbled.

■ In reviewing defendants' challenges, we bear in mind that a trial court's rulings on relevance and admissibility will not be disturbed unless there is an abuse of discretion. *United States v. Sorrentino*, 726 F.2d 876, 886 (1st Cir.1984); *United States v. Gonsalves*, 668 F.2d 73, 75 (1st Cir.1982).

### A. *The Telephone Chart Summaries*

Defendants challenge the admission into evidence of seven telephone charts depicting telephone traffic between the conspirators' homes, places of business and meeting places between May 12, 1977, and December 26, 1977, on the grounds that the foundation was inadequate, and the charts were misleading and irrelevant.

The government sought introduction of records from phone companies and various motels to corroborate the testimony of their primary witness and thus buttress the evidence of the conspiracy. The substance of those calls was not known. Defendants assert that the government could not prove that the phone calls were made in furtherance of the conspiracy, particularly those that were not corroborated by the government's witness.

---

**7.** In the Louisiana proceedings the witness had testified that he could not read English.

Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The phone records of calls which the government witnesses testified had been made to various members of the conspiracy during the organization and execution of the smuggles were relevant to show activity consistent with the course of the conspiracy as described by the government witnesses.

A number of the phone calls depicted in the chart, however, were not supported by any testimony that a conspirator had placed or received them. Defendants, in particular, challenge eleven phone calls from a public telephone at the Holiday Inn in Staten Island in May 1977. The government contends that the Holiday Inn in Staten Island was used as a "presmuggle staging area" and that the presmuggle phone calls represent organizational efforts from the motel that was later to serve as the distribution point. To support this contention, they offered records showing that Drougas had taken a room at the Howard Johnson's in Danvers and that two calls were placed from his room to Karahalis, and one from his room to the Staten Island Holiday Inn on the day the calls from Staten Island were received. Two other calls were placed on the same day and previous day from the Staten Island telephone to the Concord, Massachusetts, police barracks where Ellis worked. Ellis was out sick those days, and defendants argue there is no proof that he was the intended recipient of the phone calls. Although normally we would eschew assuming a phone call placed to a place of business was intended for a particular recipient when neither the caller nor the receiver are known, here the other phone call activity from the Staten Island motel to the Danvers Howard Johnson's where Drougas was registered, from the motel to Drougas' wife's phone, and from the motel to the government witness/conspirator's phone on the days the phone calls were placed to the state police barracks

support an inference that the phone calls were made in furtherance of the conspiracy. We, therefore, find that the phone calls contained in the government's chart meet the relevance standards of Rule 401 for admissibility.

Although the underlying evidence was properly admitted, defendants claim that the summaries unfairly called attention to certain telephone calls and prejudiced them. Rule 1006 provides:

> The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

■ Before submitting summaries or charts for a jury's inspection, the court must find there is sufficient factual basis for admitting them and that possible prejudice or confusion does not outweigh their usefulness in clarifying the evidence. J. Weinstein and M. Berger, *Weinstein's Evidence* § 1006 (1983). Charts and summaries are, for instance, inadmissible if they contain information not present in the original or duplicate materials on which they are based. *See, e.g., Pritchard v. Liggett and Myers Tobacco Co.*, 295 F.2d 292, 301 (3d Cir.1961); *Standard Oil of California v. Moore*, 251 F.2d 188, 233 (9th Cir.1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). Care must be taken to insure that summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved. *See* J. Weinstein and M. Berger, *Weinstein's Evidence* § 1006 [07] (1983).

■ Prior to the admission of the challenged summaries, the trial court conduct-

ed an extensive voir dire on the charts' admissibility and excluded the charts because they contained argumentative inferences intermingled with direct evidence, *i.e.*, the names of the coconspirators who inferentially made or received the calls rather than the person or company in whose name the phones were registered. The government modified the charts and again sought to introduce evidence of phone traffic between residences, places of business and public places used by the conspirators for meetings. We find that the charts as finally accepted into evidence pictorially summarized over one hundred calls placed during the period of the conspiracy and were properly received under Rule 1006.

Defendants Drougas, Karahalis, and Ellis also object to the admission of two Howard Johnson's placemats on which a series of handwritten names and numbers appear. The placemats seized from Ellis' apartment in 1982 are alleged by the government to depict the rough draft breakouts of the profits of the second smuggle. Defendants claim that the documents were not shown to have been written by a conspirator and do not refer to crimes charged in this case.

Rule 901 of the Federal Rules of Evidence requires that documents be authenticated or identified before they can be admitted into evidence. Authentication can be achieved through appearance, contents, substance, internal patterns, or other distinctive characteristics taken in conjunction with circumstances. Fed.R.Evid. 901(b)(4). The placemats at issue in this case were found in a conspirator's apartment, originated from the restaurant and motel chain the conspirators used as a meeting place, and depicted the first names of many of the conspirators involved in the second smuggle coupled with various four and five digit figures which were totaled. Testimony indicated that the numbers next to the word "lumpers" corresponded to amounts typically received by marijuana off-loaders. Ordinarily, such links might be sufficient authentication. In this case, however,

where the witnesses testified that they had been involved in several smuggles besides those charged in the indictment and there was a four-year time gap between the seizure of the placemats and the alleged smuggle, authentication also required that the placemats be linked specifically to the November smuggle. To provide such temporal connection, the government called a Howard Johnson's purchasing agent of printed materials to interpret the 9/11 legend printed on a corner of the mats. The agent testified that placemats of that type and print run were distributed to Howard Johnson's restaurants between October 1977 and February 1981. Defendants urge that under *United States v. Mann*, 590 F.2d 361, 370 (1st Cir.1978), a mere coincidence is not sufficient basis for admitting incriminating evidence. In *Mann* we found that being present twice on a plane in which someone was arrested for carrying drugs was not enough to infer that a passenger knew the second courier. Here, the string of coincidences is much longer and more intricate. The source of the placemats, the circumstances surrounding their seizure, the fact that the information corresponded to other evidence of the participants in the conspiracy, and the extreme unlikelihood that such a list would be prepared by one not privy to the operation of the conspiracy provide a sufficient basis to infer that the writings pertained to the conspiracy alleged and were made in furtherance of that conspiracy. *See United States v. De Gudino*, 722 F.2d 1351, 1355 (7th Cir.1983); *United States v. Wilson*, 532 F.2d 641, 644–45 (8th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976).

## VII. THE IN–COURT IDENTIFICATION OF ELLIS

Ellis contends that the government witness' in-court identification of him as a participant in the first smuggle should have been suppressed because it was the product of an impermissibly suggestive procedure.

Most of the evidence of Ellis' participation in the first smuggle was presented by

an immunized government's witness who had previously testified in a grand jury hearing in Florida that "Eddie the cop" had been involved. Sometime before this trial, he had "recalled" that the trooper's name was "Arnie," not Eddie. At trial the witness identified Ellis as the trooper who had participated in the conspiracy. The witness also testified that he had seen Ellis on a number of occasions in 1977 with various other conspirators at the Howard Johnson's, at DeFeo's salvage yard, and at Boston Harbor.

In March 1982, seven months before trial, while bail proceedings pertaining to Ellis were being held, the government witness was shown five photographs and asked if he could identify the locations of the resorts depicted therein. The pictures had been seized in Ellis' apartment and the questions were alleged to be efforts to ascertain whether Ellis was likely to flee if he were set free on bail. Two of the pictures shown to the witness prominently featured Ellis. In one picture, he and two other people are shown standing in a swimming pool with their arms folded over the side on the deck. In the other, Ellis is standing with his arm over the shoulder of another man in front of the pool. In both pictures, Ellis is wearing a T-shirt and hat with the words "Massachusetts State Trooper" printed in large letters on them. In the picture in which Ellis is in the pool, the writing on the T-shirt and hat are hidden by Ellis' arms and the shadows. In the other picture the state police insignia on Ellis' T-shirt is the main attraction, it is directly in the center of the picture, it is printed in large letters on the larger of two people in the photograph, and the photograph contains no other printing or visually arresting features. The two pictures of Ellis do not appear to be especially conducive to location identification. The other three photographs shown to the witness contain unusual landmarks or place names; the Ellis pictures show little more than Ellis, a motel swimming pool, cement deck, and several palm trees. Moreover, the government witness was not pictured in any of the photographs and there was no evidence that he had ever been to any of the locations. After viewing the photographs, the witness wrote on the back of the Ellis pictures, "Arnie the state trooper with hat on" on one and "Arnie State Trooper the taller on the left" on the back of the other. Neither picture was identified by location. The court's voir dire revealed that other photographs without defendants which were more conducive to location identification had been available but not shown to the witness. The DEA agent who caused the pictures to be shown to the witness testified in voir dire that he had not told the prosecutors that he had sent the pictures to be identified.

██ Although the government purports to argue that the pictures shown to the government witness did not constitute a suggestive identification procedure, we think such contention strains credulity. Therefore, the central question is whether, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. *Manson v. Brathwaite,* 432 U.S. 98, 107, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972). The factors to be considered in evaluating the likelihood of misidentification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382–383. In applying the *Biggers* test, we find that the government witness testified that he had been in the presence of Ellis at least half a dozen times in the course of May and June of 1977. On these occasions the witness had ample opportunity to observe Ellis in adequate light from a variety of distances. As a fellow conspirator in the smuggle, the government witness certainly had the opportunity and incentive to accurately identify Ellis. Presumably, the pres-

ence of a state trooper in a drug smuggling conspiracy is relatively rare and it behooved the witness to be able to recognize the correct trooper while acting in furtherance of the conspiracy. The witness exhibited no uncertainty in his identification of Ellis at trial seven months after making the photograph identification, although he did admit to testifying in another proceeding that the policeman involved was named "Eddie," not Arnie or Ellis. Weighing against an untainted identification is the fact that the witness had apparently never given a physical description of Ellis before . viewing the pictures and that nearly five years had elapsed between the smuggling transactions and the photographic identification.

■ We recognize that a five-year gap between the crime and the photographic identification is very much greater than would ordinarily be permissible to find an in-court identification reliable. Here, however, unlike most cases involving suggestive identification challenges, the witness was not identifying an assailant or potential assailant he viewed only once under stressful circumstances. *See, e.g., Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (rape victim viewed assailant fifteen minutes to one-half hour); *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (undercover police officer viewed drug dealer five to seven minutes); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (bank employees viewed bank robber five minutes or less); *Velez v. Schmer*, 724 F.2d 249 (1st Cir. 1984) (friends of victim viewed murderer "a minute or more"). The in-court identification was made by a coconspirator with whom Ellis had spent considerable time in nonstressful circumstances. Although we find the utterly superfluous photographic display of the Ellis photographs came perilously close to tainting the in-court identification, on balance we do not feel that the government witness' identification of Ellis denied him a fair trial.

There can be no doubt that the eye witness testimony linking Ellis to the second smuggle was admissible.

## VIII. THE PETROZZIELLO HEARING

Defendants allege that the trial court's application of the coconspirator hearsay exception rules articulated in *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977), and subsequent cases was erroneous in three respects. First, defendants contend that they were 'entitled to limiting instructions on all coconspirator statements pending the outcome of the *Petrozziello* hearing. Second, they allege the court could not properly consider the coconspirator statements in determining whether a conspiracy had been shown, and third, they allege that the evidence was insufficient for a preponderance finding that a conspiracy existed and that all the conspiractors' statements were made in the course of or in furtherance of that conspiracy.

■ Statements of coconspirators are admissible under Federal Rule of Evidence 801(d)(2)(E) only if the district court finds that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy ...." *United States v. Petrozziello*, 548 F.2d at 23. Under *Petrozziello*, as expanded in *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980), this court has ruled that the trial judge's determination of whether coconspirators' statements will be admissible should not occur until after both the government's and the defendant's evidence has been received. Hearsay evidence is thus admitted subject to the outcome of the *Petrozziello* hearing. If the government fails to meet its burden, at the close of the evidence the judge must issue a cautionary instruction or upon appropriate motion declare a mistrial if an instruction is not sufficient to cure the prejudice. *Ciampaglia*, 628 F.2d at 638.

■ Under *Ciampaglia*, the court acted properly in refusing to give defendants' requested limiting instructions pending his

determination of the admissibility of the hearsay evidence and the corresponding determination of whether a limiting instruction was appropriate. Where trial courts have given limiting instructions before holding the *Petrozziello* hearing, defendants have claimed to be prejudiced because the retraction of the limiting instruction can appear to be a judicial endorsement of the conspiracy. *See, e.g., United States v. Patterson,* 644 F.2d at 896–97. In any case, defendants, here, clearly cannot claim to be prejudiced by the court's failure to conditionally give limiting instructions since the trial court properly found the existence of a conspiracy by a preponderance of the evidence.

■ We must accept the district court's findings of fact in applying the *Petrozziello* test unless it is clearly erroneous. *United States v. Patterson,* 644 F.2d at 895. At the end of the defendants' cases the trial court indicated that without considering the hearsay testimony it found that the evidence was sufficient to find by a preponderance of the evidence that each of the defendants was part of the conspiracy. Alternatively, the court ruled that upon considering both the conspirators' statements and other evidence it found the existence of the conspiracy by a preponderance on the evidence. *See United States v. Martorano,* 557 F.2d 1, 10 (1st Cir.1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978). Leaving no stone unturned, the judge additionally found, at defense counsel's request, that if he had ruled at the close of the government's case rather than at the end of the defendants' case as suggested by *Ciampaglia,* he still would have determined that the conspiracy had been shown to involve each of the defendants as charged by a preponderance of the evidence. *See Ciampaglia,* 628 F.2d at 638. We approve the postponement of the *Petrozziello* hearing until the conclusion of all the evidence and find the defendants' argument that the district court improperly relied on hearsay evidence in making its *Petrozziello* findings to be meritless. First, the district court specifically found that, absent consideration of the hearsay testimony, there was sufficient evidence to find by a preponderance of the evidence that there was a conspiracy and defendants participated in it. Second, this court has previously stated that "hearsay and other inadmissible evidence, including perhaps the very statement seeking admission," can be considered by the district court in ruling on the admissibility of coconspirators' statements. *United States v. Martorano,* 557 F.2d 1, 11 (1st Cir.1977). While we have noted that trial judges should give little weight to the 'bootstrap' evidence in deciding whether to admit hearsay statements of coconspirators, *United States v. Petrozziello,* 548 F.2d at 23 n. 2, the district court clearly did not violate that mandate in this instance since it specifically found that the hearsay statements were superfluous to its determination.

## IX. PRETRIAL PUBLICITY

The discovery of the smuggles and arrest of the defendants in February 1982 generated a great deal of publicity in the newspapers and on radio and television, primarily due to the involvement of Corporal Ellis. Ellis contends he should have been granted a change of venue; the other defendants claim that denial of their motions for change of venue or severance from Ellis denied them a fair trial under the sixth amendment.

■ Under Federal Rule of Criminal Procedure 21(a), a change of venue may be granted if the court determines that there exists in the district "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial." Such motion is addressed to the sound discretion of the trial court and will not be reversed in the absence of an abuse of discretion. *United States v. Gullion,* 575 F.2d 26, 28 (1st Cir.1978).

■ Extensive knowledge in the community of either the crimes or the defendants is not sufficient, by itself, to render a trial constitutionally unfair. *Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290,

2303, 53 L.Ed.2d 344 (1977). Defendants must show that the trial setting was inherently prejudicial or that the jury selection process permitted an inference of actual prejudice. *Id.* at 302, 97 S.Ct. at 2302–03. Here, defendants contend that media coverage, particularly reports of the discovery of certain evidence that was later deemed inadmissible at trial on grounds of relevancy, was prejudicial because jurors may have had "subconscious preconceptions" about the case. Defendants' argument fails for two reasons: first, this court has previously recognized that the sixth amendment does not require that each juror's conscious mind be *tabula rasa,* let alone his or her subconsciousness. Rather, the relevant question is whether a juror has such a fixed opinion that he or she cannot impartially judge the guilt of the defendant. *Patton v. Yount,* —— U.S. ——, ——, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984); *United States v. Kelly,* 722 F.2d 873, 880 (1st Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984). Second, even if defendants' contentions theoretically presented grounds for granting their pretrial motions, their claims are not borne out by the facts. The five-day voir dire in this case was extensive and thorough, beginning with a group voir dire and supplemented with extensive individual questions of 111 jurors. Each of the potential jurors who indicated that he or she had read or heard anything about the irrelevant evidence was excused for cause. In fact, only one juror who recalled hearing *anything* about the case or its participants was seated and no defendant specifically challenges his impanelment. During the trial, the judge exercised great care to keep prejudicial information from the jury. He instructed the attorneys that all objections initially be made without grounds or offers of proof and called side bar conferences or dismissed the jury whenever trial procedure, trial conduct, or possibly inadmissible information was discussed. Throughout the five-month trial, the judge reiterated his instructions to the jurors that they protect their impartiality and not read, speak, nor listen to anything about this case. The voir dire in this case went well beyond the standards enumerated in *Kelly* and *Yount* for protecting a defendant's right to an impartial jury and we find no abuse of discretion in the conduct of the voir dire or the refusal to grant a severance or change of venue based on the pretrial publicity.

## X. OTHER ISSUES

Defendants' other objections do not merit extended discussion and we dispose of them summarily.

■ *Reasonable Doubt Instruction.* Defense counsel explicitly approved the reasonable doubt instruction and is thus precluded by Federal Rule of Criminal Procedure 30 from now objecting absent plain error. Use of the suggested pattern instruction from the *Federal Judicial Center Committee to Study Criminal Jury Instructions* (Federal Judicial Center 1982) was not plain error.

■ *Investigators' Notes.* Defendants assert that the scribbled sentence fragment notes taken by a DEA agent during an interview with the government witness should have been disclosed to defense counsel under the Jencks Act. DeFeo also claims that the discarding of the rough notes used in compiling the summaries of telephone calls was a Jencks Act violation. The claims are without merit. In the first instance, there was no showing that the notes contained exculpatory material so as to trigger a *Brady* obligation and the judge, after an *in camera* inspection of the jottings of the notes taken during the interview, properly determined that these were not "statements of the witness" within the scope of the Jencks Act. The telephone charts admitted under Federal Rule of Evidence 1006 were nothing more than outlines of entries of telephone records to which defendants had access.

■ *Jury View.* Defendants allege that they suffered prejudice because the court failed to grant their motion to view the Gloucester dock where the alleged offloads occurred. Where, as here, defense counsel had repeatedly expressed concern

about the possibility of the jury talking to one another or to counsel, where photographic exhibits were used to illustrate the relevant features of the dock area,[8] and where the jury view would have been time-consuming and cumulative, if not repetitive, the denial of defendants' motion for a view was proper and within the court's discretion.

■ *Alleged Prosecutorial Misconduct.* Ellis alleged that the government, in closing argument, improperly referred to matters not in evidence and injected its personal opinions of guilt. We find the evidence supported the inferences argued by the government with respect to these defendants. Given the duration of the trial and the scope and length of closing argument, occasional oblique expressions of opinion did not loom sufficiently large to cast a prejudicial shadow over defendants. *See Patriarca v. United States,* 402 F.2d 314, 321 (1st Cir.1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

■ *Length of Trial.* DeFeo claims he was prejudiced by the sheer length of the trial. A defendant has no right, constitutional or otherwise, to a trial of a particular length. Moreover, the duration of the trial was, in large part, due to defendants' constant challenges and objections and the extraordinary care taken by the trial court to protect defendants' rights.

We have considered the other assertions raised by defendants and find each to be so baseless as not to warrant comment.

*We affirm the convictions of all defendants.*

---

**8.** Defendants contested the admission of aerial photographs on the grounds that several buildings were shown on the photographs that had not been built at the time of the incident. Sure-ly, their concern about the impression that the changes in the site would convey could only have been exacerbated by a jury view.