USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2013

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOHN LiCAUSI,

 Defendant, Appellant.

No. 97-2014

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JAMES FOGARTY, III,

 Defendant, Appellant.

 ____________________

No. 97-2030

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 CHRISTOPHER DURFEE f/k/a CHRISTOPHER DUPRE,

 Defendant, Appellant.

 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 DISTRICT OF NEW HAMPSHIRE

 [Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

 Before

 Selya, Circuit Judge,
 Aldrich, Senior Circuit Judge,
 and Boudin, Circuit Judge.
 
 
 
 
 Glenn G. Geiger, Jr. with whom Geiger & Heiser was on brief
for appellant James Fogarty, III.
 Stephen A. Cherry with whom Wright, Cherry & Callen was on
brief for appellant Christopher Durfee.
 John H. LaChance with whom Victoria L. Nadel was on brief for
appellant John LiCausi.
 Donald A. Feith, Assistant United States Attorney, with whom
Paul M. Gagnon, United States Attorney, was on brief for appellee.

January 27, 1999

 
 

 ALDRICH, Senior Circuit Judge. John LiCausi, James
 Fogarty, III, and Christopher Durfee were convicted in the
 United States District Court for the District of New Hampshire
 of multiple offenses in connection with the robbery and
 attempted robbery of several grocery stores and restaurants. 
 They allege several points of error as they challenge their
 convictions and sentences. We affirm.
 I. BACKGROUND
 A. Facts
 We consider the evidence in the light most favorable
 to the prosecution, see United States v. Josleyn, 99 F.3d
 1182, 1185 n.1 (1st Cir. 1996), as we determine the basic
 facts the jury reasonably could have found. We will add to
 our sketch other facts as they become necessary to the
 discussion of particular claims of error.
 On several occasions in November of 1995, Bernie
 Subocz and defendants Durfee and Fogarty met at Fogarty's
 garage in Lawrence, Massachusetts to discuss committing armed
 robberies of supermarkets. As the meetings continued into
 December, defendant LiCausi was introduced to the group by
 Fogarty and participated in the discussions. Subocz also had
 several robbery-related telephone conversations with Fogarty
 and Durfee during this time.
 Topics of discussion included the division of
 responsibilities in obtaining necessary equipment. Subocz
 already owned a scanner for listening in on law enforcement
 radio transmissions, a frequency guide to use in programming
 the scanner, and two-way radios for communicating during
 robberies. LiCausi was to obtain a shotgun, while Subocz
 would obtain one or two pistols. Fogarty contributed $300
 towards the pistol purchase, and Subocz later had his
 girlfriend, Lori Munroe, buy two nine-millimeter semiautomatic
 pistols, a Beretta and a Smith & Wesson, and hollow-point
 ammunition. Subocz later acquired a shotgun and radio
 frequency guides for several different local areas. Fogarty
 later bought hats, gloves, jumpsuits, and three pairs of
 rubber boots.
 Members of the group soon began seeking out targets. 
 Subocz and Fogarty started things off by robbing a D'Angelo
 Sandwich Shop in Stoneham, Massachusetts on December 8, 1995. 
 Wearing masks and gloves and carrying the two loaded pistols,
 they made off with between one hundred and two hundred dollars
 each. The pair then attempted to rob a supermarket in Ohio on
 December 17. After casing the market and buying hats and a
 frequency guide for the area, they entered the store wearing
 gloves and hats and each concealing a pistol. Subocz
 initially spoke to the manager regarding a rotten head of
 lettuce he claimed to have purchased, then pulled his shirt up
 to his eyes and showed his weapon. On their way to the store
 safe, however, the manager stopped to speak to an employee,
 unnerving the robbers and prompting them to leave immediately. 
 Durfee started participating in actual robberies
 about a week later. A few days after spending the evening of
 December 23 with Subocz but failing to find a suitable target,
 the pair robbed a Burger King in Kittery, Maine after one of
 the group's meetings. They each carried one of the two
 pistols, Durfee having "rented" the Smith & Wesson from
 Fogarty for one or two hundred dollars. They both showed
 their weapons, and Subocz forced the manager to hand over all
 of the cash in the office, some $1,400. The pair netted
 substantially more, some $66,000 in cash, from their next
 robbery, that of a Vista Foods supermarket in Manchester, New
 Hampshire on January 3, 1996. Subocz first cased the market
 a few days before and notified Durfee of its potential. Then,
 on the designated evening, they hid in a closet next to the
 manager's office with the two pistols and waited for the store
 to close. They burst out of the closet, surprising the
 manager, and threatened him with their weapons. They had him
 open the safe, then cleaned it out and made their escape.
 LiCausi started participating in actual robberies
 with an attempt on a Market Basket in Woburn, Massachusetts
 during that January. Subocz, Fogarty, and either Durfee or
 LiCausi were slated to participate, and LiCausi ultimately got
 the call. After one or more of the men had cased the store
 over the course of several days, all three went there between
 five and seven o'clock the morning of their attempt. In
 addition to the standard robbery attire, including masks and
 gloves, they had the pistols, the scanner, the frequency
 guide, and the two-way radios. LiCausi wore a jumpsuit that
 Fogarty had purchased. They ultimately abandoned their
 attempt because they feared a newspaper delivery truck parked
 in front of the store contained a SWAT team or other police
 officers.
 Jason Fournier, an acquaintance of Subocz, Fogarty,
 and Durfee who had agreed sometime during the previous year to
 become involved in robberies, then joined LiCausi and Subocz
 in an attempt on a Star Market in Saugus, Massachusetts in the
 early morning of February 2. LiCausi again wore a jumpsuit
 that Fogarty had acquired and carried one of the radios and
 the Beretta pistol. Fournier wore another jumpsuit and
 carried the other radio. Subocz carried the shotgun he had
 acquired. After successfully entering the store, detaining
 those inside, and finding the safe, they fled empty-handed
 upon seeing a man walking to an automatic teller machine
 outside the store. Later that day, the trio robbed a Market
 Basket in Nashua, New Hampshire, netting approximately
 $18,000. This time LiCausi wore a jumpsuit and carried
 Subocz's shotgun, while Fournier carried the Beretta pistol. 
 Durfee then joined Subocz and Fournier for two
 attempts on a Market Basket in Portsmouth, New Hampshire. The
 first, on March 20, involved just the three of them. Subocz
 carried the shotgun and one of the radios while Durfee carried
 the Beretta. Fournier stayed outside with the other radio. 
 They abandoned their attempt, however, when the battery in one
 of the radios died. LiCausi joined them a few days later for
 a second try. Fournier was to be the lookout again while
 Durfee and LiCausi would enter the store armed with the
 shotgun and the Beretta. They left immediately, however, when
 they saw the manager become alarmed and pick up the phone.
 LiCausi was also involved in the next three
 incidents. He, Fournier, and Subocz made an attempt on a
 Market Basket in Tewksbury, Massachusetts on April 17. After
 hiding in a crawl space above the ceiling of the men's
 restroom, LiCausi and Fournier dropped down wearing their
 masks and gloves and carrying the Beretta and a BB pistol
 LiCausi had provided. They went onto the sales floor, found
 the manager, and almost had the safe open when Subocz warned
 them over the radio that two people outside were running
 towards a pay phone. They immediately left the store and
 drove off with Subocz, then fired several shots at a pursuing
 vehicle. The next day, LiCausi and Subocz made an attempt on
 a Market Basket in Warner, New Hampshire. After they stole a
 car, got dressed, and readied their weapons, they abandoned
 the attempt when a crowd outside the store failed to disperse
 and the scanner picked up a transmission about the car they
 had just stolen. Finally, LiCausi, Subocz, and Fournier
 attempted to rob a Pic-N-Pay in Portsmouth, New Hampshire on
 April 24. LiCausi carried the shotgun, Fournier carried the
 Beretta, and Subocz listened to the scanner and maintained
 radio contact from the outside. After binding several
 employees with duct tape, LiCausi and Fournier tried forcing
 the manager to open the safe. This time, the manager fought
 back, and Fournier shot and wounded him in the hand. The
 robbers escaped the struggle but left behind the Beretta
 pistol and one of the radios. This and other problems, along
 with diligent investigative work, finally led to the group's
 undoing.
 As these stories indicate, each of the defendants
 was involved in several aspects of the continuing criminal
 association among them and others. They also used much of the
 same equipment in almost all of their robberies. Many times
 one or more of the persons involved in a particular robbery
 used equipment that an associate had purchased.
 In addition, the defendants and others used many of
 the same procedures during their robberies and attempts. They
 often cased their targets, sometimes for several days. Before
 carrying out an attempt they carefully wiped down all of their
 equipment, including their two-way radios and weapons, to
 remove any fingerprints. The robberies often involved three
 individuals, two of whom entered the target premises wearing
 masks and gloves and carrying weapons while the third stood
 lookout outside. In many cases, too, a stolen "drop" car was
 used for transport to and from the robbery site while a "safe"
 car waited elsewhere.
 Finally, we note that, while each defendant's
 participation in actual robberies ebbed and flowed over the
 course of the association, communications and relationships
 continued among the three defendants and others during that
 time. For example, after the D'Angelo Sandwich Shop robbery,
 committed by Subocz and Fogarty, the two spoke by telephone
 two to three times per week, sometimes daily, and Subocz spoke
 with Durfee once or twice per week. After Subocz and Durfee
 robbed the Vista Foods supermarket in Manchester, New
 Hampshire, Durfee lent some of his share of the proceeds to
 Fogarty and took a trip to Florida with him. Subocz notified
 all three defendants when he had successfully acquired a
 shotgun. Later, when Fournier refused to do anything with
 LiCausi because he did not know him, Subocz had him speak to
 Fogarty and Durfee, who both vouched for LiCausi during
 telephone conversations. Such instances illustrate the extent
 of these persons' association, both personal and criminal.
 B. Procedural History
 A federal grand jury sitting in Concord, New
 Hampshire returned a twenty-seven count superseding indictment
 against the three defendants on January 8, 1997. Count 1
 charged all three with participating in an overarching
 conspiracy to violate the Hobbs Act, 18 U.S.C. 1951, and the
 bank robbery statute, 18 U.S.C. 2113, all in violation of 18
 U.S.C. 371. The remaining twenty-six counts charged one or
 more of them with separate robberies, attempted robberies, and
 conspiracies to commit robbery, all in violation of 18 U.S.C.
 1951, possession and interstate transportation of firearms
 in violation of 18 U.S.C. 922, use of firearms during crimes
 of violence in violation of 18 U.S.C. 924, and interstate
 transportation of stolen vehicles in violation of 18 U.S.C.
 2312.
 Counts 10, 13, 17, and 20, all charging conspiracy
 to commit robbery, were dismissed as to all defendants on the
 government's motion, and Count 9, charging conspiracy to
 commit the robbery of the Saugus Star Market, was dismissed as
 to Fogarty but not as to LiCausi. In sum, LiCausi was tried
 on the count charging an overarching conspiracy, one count of
 robbery, three counts of attempted robbery, two counts of
 conspiracy to commit robbery, four counts of using a firearm
 during a violent crime, and five counts of interstate
 transportation of a stolen vehicle. Fogarty was tried on the
 count charging an overarching conspiracy, three counts of
 conspiracy to commit robbery, one count of possession of
 firearms by a felon, and one count of transportation of
 firearms by a felon. Durfee was tried on the count charging
 an overarching conspiracy, one count of robbery, one count of
 attempted robbery, two counts of conspiracy to commit robbery,
 two counts of using a firearm during a violent crime, and one
 count of interstate transportation of a stolen vehicle.
 A jury trial began on April 2, 1997, and the jury
 returned verdicts on May 5, 1997. LiCausi was convicted on
 all counts. Fogarty was convicted on the overarching
 conspiracy count, the firearms counts, and one of the counts
 charging conspiracy to commit robbery, but was acquitted on
 the other two counts charging conspiracy to commit robbery. 
 Durfee was convicted on all counts except for one count
 charging conspiracy to commit robbery.
 LiCausi was sentenced to 1,042 months in prison plus
 three years of supervised release and ordered to pay a $1,600
 assessment and $21,206.51 in restitution. Fogarty was
 sentenced to 387 months in prison plus three years of
 supervised release and ordered to pay a $250 assessment and
 $294 in restitution. Durfee was sentenced to 437 months in
 prison plus three years of supervised release and ordered to
 pay a $700 assessment and $85,385.35 in restitution. All
 three defendants filed timely appeals outlining multiple and
 often overlapping claims of error.
 II. DISCUSSION
 A. Waived Claims of Error
 We briefly mention at the outset those claims that
 the complaining defendants have not adequately preserved. 
 First, Durfee moved for severance immediately before the
 government called Matthew O'Brien as a rebuttal witness but
 not before trial. By failing to raise the issue before trial,
 he has waived his right to pursue it here. See Fed. R. Crim.
 P. 12(b)(5); United States v. McLaughlin, 957 F.2d 12, 18 (1st
 Cir. 1992).
 Second, Fogarty claims that venue was not properly
 established as to the counts charging conspiracy to commit the
 robbery of the D'Angelo Sandwich Shop in Stoneham,
 Massachusetts and possession and transportation, respectively,
 of firearms by a felon. "It is settled beyond peradventure
 that venue is a personal privilege which can be waived." 
 United States v. Santiago, 83 F.3d 20, 24 (1st Cir. 1996). 
 Fogarty did not challenge venue on the conspiracy count until
 his motion for judgment of acquittal, and he challenges venue
 as to the firearms counts for the first time on appeal. His
 failure to raise these challenges prior to trial prevents him
 from raising them now. See id. (citing Fed. R. Crim. P.
 12(b)(2) (mandating waiver of most defenses that could have
 been, but were not, raised prior to trial)).
 Third, LiCausi challenges the sentences he received
 for his four convictions for using a firearm during a violent
 crime. See 18 U.S.C. 924(c)(1). He was sentenced under the
 statute to one five-year term for his first violation and
 three twenty-year terms for his second and subsequent
 violations, all to be served consecutively to each other and
 to the sentences imposed for his other offenses. LiCausi
 preserved an objection to these sentences based on the
 proposition that a defendant must have already served the
 five-year sentence for his first offense before a twenty-year
 sentence could be imposed. LiCausi abandoned this argument
 on appeal, thereby waiving it. See United States v. Dietz,
 950 F.2d 50, 54 (1st Cir. 1991). He argues instead that
 multiple sentences imposed under 924(c) in one proceeding,
 while required to run consecutively to non- 924(c) sentences,
 may run concurrently with each other. The law is clear that
 a defendant may not raise arguments for the first time on
 appeal that he did not seasonably address to the trial court. 
 See id. at 55 ("A criminal defendant, dissatisfied with the
 district court's rulings at sentencing yet persuaded that his
 original arguments lacked merit, cannot switch horses mid-
 stream in hopes of locating a swifter steed."). LiCausi's
 claim, then, is dead on arrival.
 Having disposed of these contentions, we may now
 address those that were properly preserved.
 B. Challenges Relating to the Convictions as to
 a Single Overarching Conspiracy
 All three defendants claim, first, that the evidence
 presented at trial was insufficient to prove a single,
 overarching conspiracy among them and the government's
 cooperating witnesses. They claim further that, given this
 alleged variance between the conspiracy charged and the proof
 at trial, they were prejudiced by the admission of
 inadmissible hearsay and by evidentiary spillover. Finally,
 both LiCausi and Fogarty claim that they should not have been
 sentenced for both conspiracy to violate the laws of the
 United States in violation of 18 U.S.C. 371 and conspiracy
 to commit robbery in violation of 18 U.S.C. 1951. 
 Addressing each one of these claims in turn, we find no reason
 to disturb the judge's rulings or the jury's verdict.
 Whether a single conspiracy or a multiple conspiracy
 exists is, of course, a question of fact for the jury. See
 United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984). In
 assessing a sufficiency-of-the-evidence challenge to such a
 finding, we credit both direct and circumstantial evidence,
 resolve all evidentiary conflicts and credibility questions in
 the prosecution's favor, and choose from among competing
 inferences the one best fitting the prosecution's theory of
 guilt. See United States v. Olbres, 61 F.3d 967, 970 (1st
 Cir. 1995). To uphold a conviction, we "need not believe that
 no verdict other than a guilty verdict could sensibly be
 reached, but must only satisfy [ourselves] that the guilty
 verdict finds support in 'a plausible rendition of the
 record.'" United States v. Echeverri, 982 F.2d 675, 677 (1st
 Cir. 1993) (quoting United States v. Ortiz, 966 F.2d 707, 711
 (1st Cir. 1992)).
 In reviewing a jury's finding that a single
 conspiracy existed, we consider specifically such factors as
 the commonality vel non of the nature, motive, design,
 implementation, and logistics of the illegal activities as
 well as the scope of coconspirator involvement. See United
 States v. Randazzo, 80 F.3d 623, 629 (1st Cir. 1996). While
 these factors inform our inquiry, however, we will leave
 undisturbed the jury's finding so long as the totality of the
 evidence sufficiently demonstrates "that all of the alleged
 coconspirators directed their efforts towards the
 accomplishment of a common goal or overall plan." Drougas,
 748 F.2d at 17. The government need not prove that each
 defendant participated in every transaction necessary to
 fulfill the aim of the overall agreement, see id., nor must it
 prove that each defendant knew every detail of the conspiracy
 or knew or had contact with every other coconspirator. See
 United States v. Mena-Robles, 4 F.3d 1026, 1033 (1st Cir.
 1993). We think that the facts outlined above, which include
 meetings involving all of the defendants and relating to
 supermarket robberies, shared equipment contributed by
 different members of the group, common participants and
 similar logistical arrangements, and close contact among
 members of the group during the life of their association,
 adequately support the jury's finding that a common goal or
 overall plan existed.
 As for individual defendants and their culpability
 vel non for involvement in that overarching conspiracy, we
 start with the principle that a defendant who has committed
 only one or a few of the crimes necessary to fulfill the aim
 of a multiple-crime conspiracy can nevertheless be convicted
 for that conspiracy if the evidence supports a finding that he
 had "knowledge or foresight of the conspiracy's multiplicity
 of objectives." United States v. Morrow, 39 F.3d 1228, 1234
 (1st Cir. 1994) (emphasis omitted). This is so "even if the
 conspiracy is open-ended (e.g., a conspiracy to rob banks) and
 the specifics of the future crimes (e.g., which banks) is
 undetermined or at least unknown to the defendant." Id. A
 defendant can be found guilty of a narrower conspiracy only if
 he agreed with others to commit one or a few crimes and had no
 knowledge or foresight of the conspiracy's broader scope. See
 id. We have no trouble finding here that each of the
 defendants had knowledge or foresight of the conspiracy's
 multiplicity of objectives. Indeed, the association formed
 here appears very much like the hypothetical one described in
 Morrow: an open-ended conspiracy where the specifics of
 future crimes were undetermined or unknown to particular
 defendants. See id. Thus, the jury properly found beyond a
 reasonable doubt that all three defendants and others formed
 a single, overarching conspiracy.
 We may therefore spend very little time on
 defendants' other claims regarding admissibility of evidence
 offered to prove the individual crimes. As to the hearsay
 testimony, "[h]earsay statements are admissible against a
 defendant when it is more likely than not that he was a
 coconspirator of the speaker, that the conspiracy existed at
 the time the statements were made, and that they were made in
 furtherance of it." United States v. Rivera, 68 F.3d 5, 7
 (1st Cir. 1995); see also Fed. R. Evid. 801(d)(2). Since the
 overarching conspiracy was adequately proven at trial, the
 testimony as to statements made regarding the individual
 robberies was properly admitted. As to the prejudicial
 spillover claim, the evidence presented was relevant not only
 to prove that the individual robberies, attempts, and
 associated crimes took place, but also to the issue of whether
 an overall conspiracy existed. See United States v. Gomez-
 Pabon, 911 F.2d 847, 853 (1st Cir. 1990) (holding that proof
 of a conspiracy may consist of circumstantial evidence and
 inferences from surrounding circumstances). It was therefore
 relevant to all of the defendants, and "[w]here evidence
 featuring one defendant is independently admissible against a
 codefendant, the latter cannot convincingly complain of an
 improper spillover effect." United States v. O'Bryant, 998
 F.2d 21, 26 (1st Cir. 1993). Moreover, the jury acquitted
 Durfee on one count and Fogarty on two counts, including one
 on which Durfee was convicted, indicating to us that the jury
 was able to assess the guilt of each defendant on each count
 separately.
 Nor do we see any merit in LiCausi's and Fogarty's
 claims that imposing separate, consecutive sentences for the
 overarching conspiracy and the individual Hobbs Act
 conspiracies violates Double Jeopardy principles. Under
 Blockburger v. United States, 284 U.S. 299 (1932), and its
 progeny, "[a] single act may constitute two different offenses
 for double jeopardy purposes so long as two different statutes
 were violated and each requires an element that the other does
 not." United States v. Claudio, 44 F.3d 10, 13 (1st Cir.
 1995). This is true of conspiracy as well as other crimes. 
 See id. (citing Albernaz v. United States, 450 U.S. 333
 (1981)). The test is satisfied here. The Hobbs Act, 18
 U.S.C. 1951, requires proof that the objective of the
 conspiracy was obstruction of the flow of commerce or an
 article in commerce. Such proof is not necessary under the
 general conspiracy provision, 18 U.S.C. 371. Section 371
 requires proof of an overt act in furtherance of the
 conspiracy, an element that the government need not prove to
 establish a Hobbs Act conspiracy. Thus, the charged
 conspiracies are two separate offenses and can be punished as
 such.
 C. Sufficiency of the Evidence as to Durfee's
 Other Convictions
 In addition to claiming that the government failed
 to prove a single overarching conspiracy, Durfee has launched
 a sufficiency-of-the-evidence attack on the rest of his
 convictions. Durfee was convicted of conspiring to commit,
 actually committing, and using a firearm in connection with
 the January 3 robbery of Vista Foods in Manchester, New
 Hampshire, attempted robbery and use of a firearm in
 connection with the attempted robbery of the Market Basket in
 Portsmouth, New Hampshire in March of 1996, and transportation
 of a stolen Ford Thunderbird from New Hampshire to Vermont.
 We believe a rational factfinder could have found
 Durfee guilty of these crimes beyond a reasonable doubt. 
 Subocz, one of the government's cooperating witnesses,
 testified at length and in great detail regarding Durfee's
 role in the Vista Foods robbery, discussing, among other
 things, where they parked their car, where they hid within the
 store, what they wore and the weapons they carried, and what
 they succeeded in taking from the store. In addition, Lori
 Munroe, Subocz's girlfriend, testified that on that evening
 she saw Subocz and Durfee come home with a box with money in
 it. As to the attempted robberies of the Market Basket in
 Portsmouth, New Hampshire, Subocz testified in detail
 regarding the participants' roles, the equipment used and
 clothing worn, which gun Durfee carried, and what caused them
 to abort their attempts. Fournier testified to many similar
 details, including Durfee's reluctance to go forward with the
 first attempt and the theft of a 1996 Ford Thunderbird for the
 second attempt. Finally, as to the stolen vehicle
 transportation, both Subocz and Fournier testified that they,
 LiCausi, and Durfee drove to Vermont and left the Thunderbird
 in a parking lot there.
 To support his claim of insufficient evidence,
 Durfee points out that his convictions rest largely on the
 testimony of cooperating witnesses. This may be true, but it
 does not help Durfee's cause. The law is clear that "an
 accomplice is qualified to testify as long as any agreements
 he has made with the government are presented to the jury and
 the 'judge gave complete and correct instructions detailing
 the special care the jury should take in assessing the
 testimony.'" United States v. Hernandez, 109 F.3d 13, 15 (1st
 Cir. 1997) (quoting United States v. Ortiz-Arrigoitia, 996
 F.2d 436, 438-39 (1st Cir. 1993)). "Indeed, a conviction
 based solely upon the uncorroborated testimony of an
 accomplice can be upheld, as long as the jury is properly
 instructed and the testimony is not incredible as a matter of
 law." Id. (citing United States v. Andujar, 49 F.3d 16, 21
 (1st Cir. 1995)).
 Here, the government elicited on direct examination
 the cooperation arrangements for each witness and introduced
 into evidence their plea agreements. The cooperating
 witnesses were extensively cross examined regarding their
 credibility, and the trial judge carefully instructed the
 jurors as to the caution they should use in evaluating their
 testimony. Finally, we do not think that the contradictions
 Durfee describes amount to the "overwhelming evidence"
 contemplated in Hernandez as necessary to make the witnesses'
 testimony unbelievable to any rational juror and therefore
 incredible as a matter of law. We hold, then, that the jury
 could have concluded beyond a reasonable doubt that Durfee in
 fact committed the crimes of which he was accused.
 D. Sufficiency of the Evidence as to LiCausi's
 Conviction for Attempted Robbery of the
 Warner, New Hampshire Market Basket
 LiCausi claims that the evidence at trial was
 insufficient to prove attempted robbery of the Market Basket
 in Warner, New Hampshire. To prove attempt, the government
 must establish an intent to commit the substantive offense and
 a substantial step towards its commission that is more than
 preparation but less than the last act necessary to commit the
 crime itself. See United States v. Chapdelaine, 989 F.2d 28,
 33 (1st Cir. 1993) (citing United States v. Figueroa, 976 F.2d
 1446, 1459 (1st Cir. 1992); United States v. Manley, 632 F.2d
 978, 987 (2d Cir. 1980)). According to LiCausi, the evidence
 at trial failed to establish the "substantial step." We
 disagree.
 The evidence showed that on April 18, 1996 Subocz
 and Munroe, their daughter Brianna, and LiCausi were in the
 Warner area looking for potential robbery targets. The group
 saw the Market Basket from the highway and turned off to
 determine its viability as a target. Munroe and LiCausi went
 inside, looked over the store, and returned to tell Subocz
 that its arrangement was similar to that of most other Market
 Baskets. Subocz and LiCausi decided to rob it. LiCausi then
 stole a car, which they placed in a McDonald's parking lot
 right next to the Market Basket. Subocz and LiCausi began
 observing the store through binoculars, and Subocz set the
 radio scanner to pick up local police frequencies. At some
 point, the group drove in Munroe's car to a secluded area not
 far from the store, where Subocz and LiCausi changed into
 their robbery clothes, including gloves, and readied their
 weapons, the shotgun and the Beretta pistol. Then they
 returned to the McDonald's parking lot and continued to
 observe the Market Basket. The scanner picked up a radio
 transmission having something to do with a water treatment
 center. Concerned that this might mean a greater police
 presence in the area, they drove back to the area where
 LiCausi had stolen the car and saw some state troopers there. 
 Unsure whether the police presence was due to the stolen car
 or the intercepted radio call, the group returned to the
 McDonald's parking lot. Subocz and LiCausi ultimately
 abandoned their plan because a group of people in front of the
 store showed no signs of leaving and because they heard
 another radio transmission related to the car they had stolen.
 We have found the "substantial step" requirement
 satisfied in similar circumstances. In Chapdelaine, for
 example, the defendant and his associates had "'cased' the
 BayBank branch and the armored truck, positioned stolen
 vehicles for an escape, acquired weapons and disguises,
 arrived at the scene ready to commit the crime and were
 frustrated only by an accidental change in the truck's
 schedule." Chapdelaine, 989 F.2d at 33. In another case, the
 group's conduct "in casing the bank, stealing a car, and
 arriving armed at the bank shortly before the Wells Fargo
 truck was to arrive, constituted a 'substantial step' toward
 the robbery that demonstrated that this [intent to commit the
 robbery] was no idle whim." United States v. Del Carmen
 Ramirez, 823 F.2d 1, 2 (1st Cir. 1987).
 The robbers in Del Carmen Ramirez were alerted to
 a police stakeout of the robbery location, tried to put their
 guns in some tall grass and leave the area on foot, and were
 subsequently arrested. See id. LiCausi's and Subocz's
 preparations were virtually identical to those in Del Carmen
 Ramirez. The reason for the abandonment, be it impossibility,
 as in Chapdelaine, or fear of capture, as in Del Carmen
 Ramirez, is irrelevant. The only issue is whether the actions
 Subocz and LiCausi took before abandoning their plans
 constituted the requisite "substantial step." Given First
 Circuit precedent, we think it clear that they did.
 E. Denial of Fogarty's Motion to Sever
 Fogarty claims that his pretrial motion to sever
 should have been allowed and that, as a result of its denial,
 he was significantly prejudiced by the admission of evidence
 relating to several crimes in which he was not involved. We
 find no error.
 The government may join multiple defendants in a
 single indictment where "at least one count alleges a
 conspiracy . . . and the indictment separately alleges that
 the appellant committed a substantive offense." United States
 v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998); see also Fed. R.
 Crim. P. 8(d). "The federal courts have long recognized that
 consolidated trials tend to promote judicial economy, conserve
 prosecutorial resources, and foster the consistent resolution
 of factual disputes common to properly joined defendants." 
 United States v. Josleyn, 99 F.3d 1182, 1188 (1st Cir. 1996). 
 Where, as here, multiple defendants have been
 properly joined for trial, a defendant may nevertheless
 request severance when it appears that he is prejudiced by the
 joinder. See Fed. R. Crim. P. 14. "We reverse the decision
 to deny a motion for severance only upon a showing of strong
 prejudice, demonstrating a manifest abuse of discretion that
 deprived the defendant of a fair trial." United States v.
 Nason, 9 F.3d 155, 158 (1st Cir. 1993). The appellants thus
 bear the burden of proving "prejudice greater than that which
 necessarily inheres whenever multiple defendants . . . are
 jointly tried." United States v. Walker, 706 F.2d 28, 30 (1st
 Cir. 1983). They must prove "prejudice so pervasive that a
 miscarriage of justice looms." United States v. Pierro, 32
 F.3d 611, 615 (1st Cir. 1994). This high standard accords
 with the Supreme Court's instruction that "a district court
 should grant a severance under Rule 14 only if there is a
 serious risk that a joint trial would compromise a specific
 trial right of one of the defendants, or prevent the jury from
 making a reliable judgment about guilt or innocence." Zafiro
 v. United States, 506 U.S. 534, 539 (1993).
 We find no abuse of discretion in this case. While
 the jury did hear extensive testimony relating to several
 crimes in which Fogarty was not involved, that fact does not,
 by itself, create sufficient prejudice: "It is well settled
 that, '[e]ven where large amounts of testimony are irrelevant
 to one defendant, or where one defendant's involvement in an
 overall agreement is far less than the involvement of others,'
 the court of appeals must be 'reluctant to second guess
 severance denials.'" United States v. O'Bryant, 998 F.2d 21,
 26 (1st Cir. 1993) (quoting United States v. Boylan, 898 F.2d
 230, 246 (1st Cir. 1990)).
 Moreover, since all three defendants were charged
 as coconspirators, almost all of the evidence relating to
 other defendants was relevant to, and therefore independently
 admissible in, the prosecution's case against Fogarty. As we
 have said, this circumstance precludes a spillover argument. 
 See id.; see also United States v. Brandon, 17 F.3d 409, 440
 (1st Cir. 1994)(quoting United States v. Searing, 984 F.2d
 960, 965 (8th Cir. 1993) ("In the context of conspiracy,
 severance will rarely, if ever, be required.")).
 Finally, the fact that the jury acquitted Fogarty
 on two counts indicates that the jury was not prevented from
 making reliable judgments about guilt or innocence, but was
 able to weigh the evidence independently against each
 defendant. See United States v. Flores-Rivera, 56 F.3d 319,
 326 n.2 (1st Cir. 1995) (finding that acquittals suggested
 "that the jury was able to sift through the evidence in an
 analytical fashion and that the alleged spillover effect did
 not cause the jury merely to enter a lump sum conviction");
 Brandon, 17 F.3d at 440 (finding acquittals to be a relevant
 factor in upholding a district court's denial of a severance). 
 For all of these reasons we affirm the judge's decision to
 deny Fogarty's motion to sever.
 F. Hearsay Testimony of Laura Watson and Lisa
 Munroe
 LiCausi claims that certain testimony from two
 witnesses, Laura Watson and Lori Munroe, was inadmissible
 hearsay. We find error only in the admission of Munroe's
 testimony but find insufficient prejudice to warrant a new
 trial for LiCausi.
 LiCausi challenges, first, the testimony of Watson,
 an acquaintance of Fournier's, as to certain statements by
 Fournier after the attempted robbery of the Pic-N-Pay in
 Portsmouth, New Hampshire. Watson testified that she left
 work at Bickford's restaurant in Portsmouth at about 11:30 PM. 
 She saw Fournier, who asked for a ride home and for help
 finding a friend he had lost near the Holiday Inn. Watson was
 then allowed to testify, over objection, that Fournier's
 friend's name was "John." When they could not find "John,"
 she drove him to his residence. LiCausi argues that
 Fournier's statement identifying his friend as "John" was
 improperly admitted as a statement in furtherance of a
 conspiracy.
 As we discussed earlier, a hearsay statement is
 admissible against a defendant if the trial court finds that
 it is more likely than not that (1) the defendant was a
 coconspirator of the speaker; (2) the conspiracy existed at
 the time the statement was made; and (3) it was made in
 furtherance of the conspiracy. See United States v. Rivera,
 68 F.3d 5, 7 (1st Cir. 1995) (citing United States v.
 Petroziello, 548 F.2d 20, 23 (1st Cir. 1977)). A district
 court's findings of fact in applying this test must be upheld
 unless they are clearly erroneous. See United States v.
 Fields, 871 F.2d 188, 193 (1st Cir. 1989).
 Given our discussion as to the conspiracy counts,
 supra, we have no difficulty accepting the trial court's
 finding that a conspiracy existed and that both Fournier and
 LiCausi were members of it. The closer question is whether
 the trial judge permissibly found that Fournier's statement
 identifying his "friend" as "John" was in furtherance of the
 conspiracy. We have observed in the past that "there is no
 'talismanic formula for ascertaining when a conspirator's
 statements are 'in furtherance' of the conspiracy.'" See id.
 at 194 (quoting United States v. Reyes, 798 F.2d 380, 384
 (10th Cir. 1986)). The statement is admissible if it "tends
 to advance the objects of the conspiracy as opposed to
 thwarting its purpose." United States v. Fahey, 769 F.2d 829,
 838 (1st Cir. 1985). We accept that looking for LiCausi was
 in furtherance of the conspiracy. To help by identifying him
 as John may have been of questionable value, but it was
 presumably so intended. We are not "left with the definite
 and firm conviction that a mistake has been made." Mitchell
 v. United States, 141 F.3d 8, 17 (1st Cir. 1998).
 We come to a different conclusion regarding the
 admissibility of Munroe's testimony as to certain statements
 by Subocz. Before going to Ohio with Fogarty to rob a
 supermarket, Subocz told her that he was going away to do a
 carpet job. Sometime after he returned, he told her that at
 one point he and Fogarty had been in a supermarket with a gun
 but did not attempt a robbery because it did not feel right. 
 Subocz also told Munroe details of what happened during the
 Saugus Star Market robbery attempt, the Nashua Market Basket
 robbery, and the Portsmouth Pic-N-Pay robbery attempt. These
 statements cannot fairly be considered in furtherance of the
 conspiracy. All but one were made after the crimes they
 described took place, and they do not appear to have yielded
 significant enough information to constitute reports to a
 coconspirator, assuming Munroe could be considered as such. 
 Rather, they appear to us to be instances where Subocz was
 merely blowing off steam or venting anxiety. Subocz's lie
 about his trip to Ohio is a closer call, but we think that it
 is more appropriately characterized as made simply to avoid an
 argument with his girlfriend. Thus, we think the statements
 were not made to advance the conspiracy and were inadmissible.
 While these statements may have been improperly
 admitted, we do not think they worked such prejudice that a
 new trial is necessary. The testimony was cumulative and the
 weight of the additional evidence overwhelming. That
 additional evidence pointed to LiCausi's deep involvement in
 the conspiracy and the individual crimes that Subocz discussed
 with Munroe. The government elicited extensive testimony on
 those topics, some of which was corroborated by toll records
 and other evidence. Accordingly, we think it highly probable
 that the error in admitting Lori Munroe's hearsay testimony
 did not contribute to the verdicts. See United States v.
 Rose, 104 F.3d 1408, 1414 (1st Cir. 1997). The error
 therefore need not concern us.
 G. Admissibility of Special Agent Mulvaney's
 Testimony
 Durfee claims that the trial court erroneously
 allowed FBI Special Agent John Mulvaney to testify regarding
 a telephone call, charged to Munroe's account, made on January
 2, 1996 to that number. Based on investigation he conducted
 on April 9, 1997, Agent Mulvaney testified that the number
 from which the call was made was that of a pay phone located
 at the Vista Foods supermarket in Manchester, New Hampshire. 
 According to other testimony, Subocz and Durfee attempted to
 rob that supermarket on January 3, the day after the call was
 made. Durfee argues that Agent Mulvaney's testimony was
 erroneously admitted because disclosure of Agent Mulvaney's
 report after Subocz had testified regarding the Vista Foods
 robbery attempt deprived defense counsel of the opportunity to
 cross examine Subocz regarding the call, because the testimony
 was irrelevant given Subocz's testimony that no advance
 planning occurred before the attempt, and because the evidence
 was more prejudicial than probative. We reject all three
 contentions.
 First, we see no prejudice in the disclosure of the
 projected testimony after Subocz had testified. Durfee
 apparently had the phone records and an investigator and could
 have made his own investigation had he deemed it necessary. 
 In addition, he had no right to the results of Agent
 Mulvaney's investigation under the Federal Rules of Criminal
 Procedure, see Fed. R. Crim. P. 16(2) (including as
 information not subject to disclosure "reports, memoranda, or
 other internal government documents made by the attorney for
 the government or any other government agent investigating or
 prosecuting the case"), nor was the information Brady or
 Jencks Act material. Absent a special right to disclosure of
 information, the trial lawyer must make judgments about what
 information is significant and what information is not. Then,
 based on those judgments, he must prepare to meet what he
 thinks opposing counsel will present as evidence. When the
 lawyer miscalculates, he risks being caught unprepared. That
 is apparently what happened here, and we will not recast
 defense counsel's tactical decision (or oversight, perhaps)
 into a trial error.
 Moreover, the trial judge invited defense counsel
 to recall Subocz if he wished, but defense counsel failed to
 do so. He contended during oral argument that, assuming the
 nondisclosure was improper, this remedy was inadequate because
 later cross examination would be less effective. But the
 opportunity was there, and, given this and all of the
 circumstances, we fail to see how Durfee's due process rights
 have been violated.
 Durfee's second argument, that the results of Agent
 Mulvaney's investigation were irrelevant, fares no better. 
 The test for relevance is, of course, whether the piece of
 evidence sought to be introduced has "any tendency to make the
 existence of any fact that is of consequence to the
 determination of the action more probable or less probable
 than it would be without the evidence." Fed. R. Evid. 401. 
 The occurrence of a phone call from the Vista Foods parking
 lot charged to Subocz's telephone account and made to Durfee's
 residence clearly is circumstantial evidence tending to make
 it more probable that Subocz cased the supermarket, that he
 told Durfee it was a good robbery target, and that the two
 ultimately robbed it. Subocz's testimony that they committed
 this robbery with no planning, radios, lookout, safe car, or
 drop car does not change matters. It does not follow
 automatically from that acknowledgment that Subocz and Durfee
 were simply walking by the store and decided without prior
 discussion to rob it. While the pair did not make the same
 preparations that became standard operating procedure in other
 robberies, testimony did establish that Subocz did case the
 store and tell Durfee about it. In light of this evidence we
 think that testimony as to the location of the number listed
 in the toll records was most certainly relevant.
 Nor do we believe that the testimony was more
 prejudicial than probative. See Fed. R. Evid. 403. We review
 such a claim only for abuse of discretion, United States v.
 Cruz-Kuilan, 75 F.3d 59, 61 (1st Cir. 1996), and find none
 here. Durfee argues that the government created an unfair
 inference as to the call's content and significance by merely
 presenting evidence of the call and failing to question Subocz
 as to its contents. However, the evidence of the call was
 circumstantial evidence of Durfee's participation in the
 robbery, evidence upon which the jury was entitled to rely in
 determining Durfee's guilt. Such evidence is, of course,
 always prejudicial to the defense, and we do not think that
 the government's failure to question Subocz regarding the
 phone call, whether by oversight or by design, made Agent
 Mulvaney's testimony unfairly prejudicial such that Rule 403
 mandated exclusion.
 H. Admissibility of Matthew O'Brien's Testimony
 LiCausi claims that the trial judge erred in
 admitting as the government's rebuttal evidence the testimony
 of Matthew O'Brien. O'Brien testified that he had seen
 Fogarty and LiCausi at the Hillsborough County Jail while he
 was awaiting sentencing for an unrelated offense. Fogarty and
 LiCausi, who were being held pretrial, asked him to tell
 Fogarty's lawyer that Fournier told him that Fournier's
 brother and Subocz's brother, not LiCausi and Fogarty, had
 been involved with Subocz and Fournier in the armed robberies. 
 LiCausi claims here that the evidence was not proper rebuttal
 and was so inflammatory that allowing its admission at such a
 late stage of the case amounted to an abuse of discretion. We
 disagree.
 "Rebuttal evidence may be introduced to explain,
 repel, contradict or disprove an adversary's proof." United
 States v. Laboy, 909 F.2d 581, 588 (1st Cir. 1990). The fact
 that testimony would have been more appropriately offered
 during the proponent's case-in-chief does not preclude its
 admission as rebuttal evidence. See United States v. Clotida,
 892 F.2d 1098, 1107 (1st Cir. 1989) (citing United States v.
 Luschen, 614 F.2d 1164, 1170 (8th Cir. 1980)). Rather, the
 decisions as to what constitutes proper rebuttal evidence and
 the order in which the parties present their evidence lie
 within the sound discretion of the trial judge and are subject
 to substantial deference. See id.; United States v. Thuna,
 786 F.2d 437, 444 (1st Cir. 1986).
 In this case, Subocz testified in great detail
 regarding the attempted robbery of the Saugus Star Market in
 the early morning hours of February 2, 1996 and the events of
 the evening before. He also testified in detail regarding the
 robbery of the Nashua Market Basket that evening. He named
 LiCausi as a participant in both incidents. Munroe also
 testified that LiCausi was with Subocz the night and early
 morning of the Star Market attempt. Fournier also testified
 as to LiCausi's involvement in the two incidents.
 In his defense, LiCausi called several alibi witness
 who testified that LiCausi was out with friends almost all
 night on February 1 and arrived at his sister's house between
 5:30 and 6:00 PM on the evening of February 2 to babysit her
 children. Accepting this testimony over that of Subocz,
 Munroe, and Fournier would mean that LiCausi could not have
 participated in the Star Market attempt or the Market Basket
 robbery.
 We note first that Matthew O'Brien's testimony had
 no particular connection to any defense witness, and therefore
 as a practical matter could not be offered during cross
 examination. As such, the evidence could have been offered
 only during the government's case-in-chief or as rebuttal. 
 The potential admissibility during the case-in-chief is not
 controlling, of course, and we find no abuse of discretion as
 to its admission on rebuttal. Matthew O'Brien's testimony,
 while not directly contradicting the testimony of LiCausi's
 alibi witnesses, certainly tended to disprove or refute their
 testimony by undermining its credibility. Given these facts,
 we do not think that the trial judge abused his broad
 discretion in allowing O'Brien to testify.
 I. The Restitution Order as to Durfee
 Finally, Durfee argues that the district court erred
 in ordering restitution in the amount of $85,385.35 without
 properly considering his financial resources. We review
 restitution orders for abuse of discretion, see United States
 v. Newman, 49 F.3d 1, 10 (1st Cir. 1995), and find none here.
 We have repeatedly pointed out that the provision
 addressing restitution, 18 U.S.C. 3664(a) (1994), does not
 require an explicit finding that the defendant has the ability
 to pay the restitution ordered. Rather, "it is sufficient if
 the record on appeal reveals that the judge made implicit
 findings or otherwise adequately evinced his consideration of
 those factors." Newman, 49 F.3d at 10. Here, the record
 reveals just that. First, the court explicitly adopted the
 factual findings of the presentence investigation report,
 which included information relating to Durfee's financial
 condition, earning ability, and ability to pay.
 Second, the court recognized the possibility that
 Durfee's financial prospects might improve. As this court has
 held, "there is no requirement that the defendant be found
 able to pay now." United States v. Lombardi, 5 F.3d 568, 573
 (1st Cir. 1993); see also United States v. Vankin, 112 F.3d
 579, 592 (1st Cir. 1997) ("A defendant's impoverishment today
 is no assurance of future poverty, and, hence, present
 impecuniousness is not a bar to the imposition of
 restitution."); Newman, 49 F.3d at 10. Accordingly, "[a]
 sentencing court permissibly may take into account a
 defendant's earning capacity and the prospect that his
 fortunes will improve." Vankin, 112 F.3d at 592. Here, the
 court refused to speculate on Durfee's inability to pay after
 his release, thereby acknowledging the possibility that
 Durfee's fortunes might improve. Thus, we think this record
 shows that the trial judge adequately considered Durfee's
 financial situation and did not abuse his discretion in
 arriving at a restitution amount.
 III. CONCLUSION
 Despite the defendants' valiant efforts at finding
 error compelling us to reverse, careful analysis of the issues
 presented leads us to conclude that neither a new trial nor
 resentencing is warranted. The defendants' convictions and
 sentences are therefore affirmed.